May it please the court. My name is John Judge. I represent Ron Heggemeier. At the time of the events, in this case, he was a 63-year-old white male Republican lawyer who suddenly found himself in the role as a plaintiff in a race discrimination, age retaliation, due process, and public employee whistleblower case. We don't see that set of demographics very often in our little employment law practice, but that's what we have in this case. Now, as a preliminary comment, I want to draw your attention to the fact that you've got four elected officials testifying in this case, three county commissioners and one county judge. All of those officials are authorized to speak on behalf of the governmental entity that they were elected to govern. There's no higher authority in American law than the authority of an elected official to speak on behalf of his entity. I mention that because in the briefing, I expect in some of Mr. McGee's arguments, you're going to hear attempts to discount some of County Judge Bond's testimony. I remind you now and as many times as I'll get the chance, County Judge Bond was the chief executive officer of the defendant. Everything he said was a judicial admission on behalf of the defendant. There are also judicial admissions made by the three commissioners who are on the opposite side of this fight. We've pointed out that they contradict themselves several times in this case, but we submit that it's not proper . . . I'm going to tell the world that it was racially motivated when there's no evidence that it was. Is that a judicial admission that's forever binding on the courts? When the official makes that statement under oath, it's evidence. Even if there's nothing . . . it's the opinion of that council member and there's no evidence otherwise to support . . . If he says it under oath in the context of the judicial proceeding, yes, Your Honor, it's evidence. It's evidence that a jury gets to consider. What type of evidence? Are you making a direct evidence argument now? I thought your brief argued that in the context of a circumstantial case. Parts of the evidence are circumstantial. Parts of it are direct. In your brief, there are two different approaches to a Title VII case. One is the direct evidence approach and the other is the burden shifting for a circumstantial case. I'm asking, are you referencing Bond's statements as a direct evidence argument or are you still traveling under circumstantial evidence? I'm saying that there are both in this case. There's circumstantial evidence that arises, for example, from the race-based governance decisions that bracket the action in this case. The commissioner's attempts to protect a Hispanic officeholder's position when it was against the best interest of the county and the action of firing or abolishing Administrator Hegemeyer's position. All of those are bracketed and at the same time treating the department head of the indigent care unit much more favorably, 14 times more favorably than Mr. Hegemeyer. That's circumstantial evidence, yes. But back to this admission, Commissioner Bond was asked, on what basis do you have the opinion that the discharge or the termination of this unit was race-based? He said, well, because the other three commissioners, two are Hispanic, one is African American, and they take care of their own. I mean, doesn't that, as you put, bracket the judicial admission? He didn't have any . . . That certainly . . . That was his opinion based on the fact that they were of a different race than he was. That certainly goes to the weight and credibility to be given that testimony, but it's still testimony that a jury is entitled to hear. That's our position. Now . . . With regard to, is it Ms. Chavarria? I'm not sure how you pronounce her name. I'm not either. Chavarria, I think. What is the evidence, if any, as to what she was paid as opposed to what Mr. Hegemeyer was paid? What was the . . . I don't . . . Was their compensation comparable? They were both department heads. There is no evidence as to the dollar amounts. The disparity comes in in the length of time for severance that he got, that she got, versus what he got. Well, there's disparity in the number of years they worked. She worked for 20 years. Yes, ma'am, she worked . . . He worked for three, so they're not exactly similarly situated, I don't think. She worked, I believe, for 19 years. She worked for four times as long as he did. She got 14 times as much severance time as he did. Well, just because someone's a department head doesn't mean they have the same duties as another department head if it's another department. The difference in magnitude, but the substantive principle remains the same. They treated one better than the other, 14 times better than the other. What they took up the issue of terminating the departments, what, a week or two apart at different meetings? Just a few days. Okay, so if they . . . I'm not sure the decision, what you infer from that. We're going to terminate this department on X date. Because of longevity of service, we're going to give her a few more days in the grand scheme of things. That's not exactly how it worked out. It was a little more Byzantine. You could see sandbags dropping and people getting ready for the next reaffection, which was the county administrator. First of all, the county judge recommended that she be given . . . How much money are we talking about? I don't know. I don't know either one of their salaries, but they're comparable because they're both department heads. Let's say $100,000 a year. Okay, so how much money are we talking about, assuming she made $110,000 or $100,000? She got 40 days severance, 41 days severance. He got three. So put a dollar number on it. Please don't ask me to do arithmetic without a calculator. The amount is not nearly so important as the principle. If the amount is what controls, then we're just reduced to cash register justice. I don't think that's . . . It depends on which claim. If he fails to succeed on the race claim or the age retaliation claim or the state law whistleblower claim, but succeeds only on the due process claim, the judge, when you let us try this case again, will put damages to the jury, but if he only succeeds on that due process claim, he'll get three months wages as his economic damages. Of course, he gets compensatory damages under 1983 and attorney fees, maybe. Your hope . . . But it depends. It depends on which claim he recovers under. The elements of damage under the state law whistleblower claim and the two Title VII claims would be to the jury on questions. They would not be limited to the three months he had left on his due process rights in the county administrator's job. Now, that's a very important concept because it involves whether or not he had a protected property right. Does this mean I've used 10 or 15 minutes? You have five minutes. I have five minutes more of my first . . . Okay. I wasn't paying attention. It's the math, you know. It is. That's why I didn't even apply to medical school. Did he have a constitutionally protected property right in his job? And, of course, if his position were at will, no, he did not. But his position was not at will. He was not an elected official. No, he was an appointed official, appointed to a one-year term. Now, Judge Owen and I both know a little bit about at will employment. And we both know, we all know, that the key defining feature of an at will employment agreement is that it is of indefinite duration. That's the case you just heard before us. Not employment, but still a contract that is of indefinite duration. If it's of indefinite duration, it could well be illusory. But Mr. Hegemeyer's appointment as county administrator came about solely because of its inclusion in the budget. And the budget says right on its very first line, this is for one year. I don't think that means that the county can't terminate anybody for a year. Well, John Cornyn and Greg Abbott disagree with you. They have said again and again in their attorney general opinions, you can't go in and micromanage the budget during the one-year budget cycle. Could Judge Bond terminate his employment? Judge Bond probably could have walked off the job. I'm saying, could Judge Bond . . . I'm sorry, Judge Bond. Judge Bond was the appointing official, as distinguished from the commissioners. And he may have been able to, but I wouldn't give him that authority this afternoon. Not due to the fact that Mr. Hegemeyer's position, his department, was tied to that one-year budget. No, I don't think he could. Well, I've at least read your brief that way. So just hypothetically, if Judge Bond could terminate your client's employment, then how could your client have a property interest in that job? Well, the way you asked the question, Your Honor, I don't think he could do it. I don't think he could terminate that employment during the term of the budget cycle. Let's assume for the sake of argument that he could. Then I'm in trouble. Then I'm in trouble. Show me a Texas case or statute that says if a county is running out of money, notwithstanding what their budget says, they can terminate employees to start cutting the budget, their actual expenses. There is a principle in contract law. I know it's written into the education code. When you have financial exigency, you can do things that you wouldn't otherwise be able to do, but that's certainly not the case here. They had excess reserves. Show me the AG case that says you cannot terminate an employee simply because there's a line out of budget for their salary or their hourly wage or whatever. Well, in 1999, John Cornyn, citing Pritchard v. Abbott, which is a 1961 Texas Supreme Court case, says that once salaries of officers and employees are set, they may not be reduced outside the regular budget adoption and amendment process. That's changing them. That's not saying you can't terminate them. May not be reduced. Then in 2000, John Cornyn says authority to determine resources. The county has authority to determine resources it would allocate, but it cannot micromanage the county judge's decisions as to the use of the allocated resources during the budget term. Again in 2000, John Cornyn says the county officer has implied authority to set the working conditions for his employees. Then picking up in 2003, Greg Abbott told us that the sphere of authority includes personnel matters and cited this court in Familius Unitas as authority for that proposition. That's 619 Fed Second, page 391. And he said the same thing in 2005. Once the budget is adopted and the salaries are set, the commissioner's court, and here we go, Judge Owens, cannot reduce or eliminate the salaries of the employees who work under another elected official. And that ties right back into the Pritchard v. Abbott rationale from the Supreme Court of Texas because elected officials have a unique sphere of influence and the appointees of elected officials have special protected status. All right, sir, your time is up, but you have five minutes for rebuttal. Thank you. I appreciate your attention. You're welcome. Mr. McGee. May it please the court, my name is Eric McGee and I represent Caldwell County, the commissioner's court, Commissioner Alfredo Munoz, Commissioner Ernesto Madrigal, and Commissioner Joe Rowland. The district court in this case properly granted summary judgment in favor of the county and the county officials. Further, the district court properly granted the county and the county officials' motion to dismiss as the plaintiff's section 1983 claim that he did not have a property interest in employment. I'd like to go into that one first as those were where Mr. Judge left off. Specifically, those AG opinions that he is talking about talks about the authority of the budget. The budget is set by the county commissioner's court. The duties and responsibilities of each elected official, whether it be your sheriff, your county tax collector and assessor, the county clerk or the district clerk, as mentioned in those various opinions from the AG's office, they come to the commissioner's court and propose their budget for the year as how they are able to do their duties under Texas law. Specifically, most of those duties found in the Texas local government code for the various elected officials within Texas. Those opinions say the commissioner's court at that time cannot go back during the budget year and tell the district clerk or the tax collector and assessor or the sheriff, we're going to cut your budget in half and you're not going to be able to fulfill your duties. That's not what happened in this case. None of those opinions from the attorney general's office are applicable in this case. What about the reference to termination? What about the reference to termination that Mr. Judge just read from Greg Abbott's opinion? The termination here is in this particular case is the commissioner's court cannot amend the budget and terminate someone in one of the other county officials' offices. In this case, that is not the case here. Mr. Hegemeyer, the county administrator, is not under the sphere of authority of the county judge. There's nothing in the local government code that gives statutory authority to county judge Bond to have a county administrator. There's no duties that he is performing. He is performing the duties assigned to the commissioner's court. The commissioner's court in this case speaks through its official minutes. And if you go back and look at the summary judgment evidence, the magistrate judge, particularly in this case, did an excellent job of looking at every piece of evidence in here. And what he concluded was that there was a specific outline of how Mr. Hegemeyer became employed. First and foremost, he was the attorney for the commissioner's court. He was not the county administrator. He was the assistant district attorney serving in a civil role, providing legal advice to the county court, the commissioner's court. That's supported in our evidence under... That's by the board. So what was he when he became county administrator? What does the record say about that? The records say, specifically, if you look at page 626 and 627, the records on appeal, there is his job description attached to the affidavit of the current, at that time, county civil attorney. And it says that the county court administrator is appointed by the commissioner's court. The administrator serves as the chief of staff for various departments that are not headed by an elected official. The administrator and his staff oversee the implement, the broad policy discretion from the commissioner's court. It goes on to say that the administrator is the direct manager for the departments reporting to the commissioner's court. He's not reporting to the county judge. These departments report to the commissioner's court. And interestingly, if you go look at that job description and even cite it in his brief, I think on page 6, Mr. Hegemeyer's brief says his responsibilities include overseeing and implementing that broad policy and managing eight Caldwell County departments. One of those departments was the indigent health care department. Those two individuals were not similarly situated. He was her manager. Yes, she was a department head, but she answered to him. Specifically, in his job description, it says that the departments report to the commissioner's court and he, the county administrator, coordinates administrative functions of those department heads by the other elected officials. The administrator assists the court in developing policy and directs its implementation and continuing to deliver services to the community. And it lists the eight departments, as he references in his brief. But in our summary judgment evidence, it actually shows you what each one of those departments are. With regard to the race discrimination claim, when did Commissioner Madrigal say that the Tejana Democratic Party, its job was to put a Mexican in every office? When did he say that? There's no summary judgment evidence to that. What is in the summary judgment evidence is that was not said during commissioner's court. It had nothing to do with the county. It was part of a fundraising event for the Tejano Democratic Party. He was selling raffle tickets. Judge Bond came by and said, why are you selling these raffle tickets? He said on behalf of the Tejano Democratic Party, we're trying to put a Hispanic in every office in the county. As the magistrate judge in his report and recommendation said, that was just a comment in passing. It was a joking comment. It was a straight comment. It in no way referenced Mr. Hegemeyer or any of the other elected county offices. We've heard some discussion today about Ms. Shavira, who was a head of the . . . Can I stick with the comments for just a minute? Yes. You never objected to the admissibility of those comments, did you, under 56C2? No, I did not. Did the magistrate judge conclude that they were inadmissible? Those comments? I don't think he did, but . . . No, he said in his report that when he went through the racial discrimination, I think the magistrate judge did an amazing job of looking at every single piece of evidence and applying it back to Mr. Hegemeyer's claims. He went through the direct evidence that was cited in their claims, also raised in their response to our MSJ. He went through the indirect evidence analysis. He talked about the legitimate, non-discriminatory reason. And then he went specifically to that pretext issue, where he said that that Tejano Democratic remark is about that party, that political party, and had nothing to do with the county nor the plaintiff's employment. And when a remark was made, it didn't further any cause. So when you look . . . The question is whether or not a reasonable juror could conclude that that remark demonstrated racial animus, right? And that's the test that the magistrate judge provided. Correct. And so, isn't the magistrate judge engaging in some weighing of the evidence here when he says that that doesn't reflect racial animus? If I were to make the comment that it's going to be my goal to have only white men as law clerks, would that not reflect an animus? Except Commissioner Mondragal cannot hire and fire anyone on his own. He was not sitting as a commissioner on the commissioner's court at that time. He's a decision maker. He's a decision maker. He's one of the votes for the decision maker. Right. He was one of the decision makers. True? True. And would that . . . I mean, can you say without weighing the evidence that that doesn't reflect racial animus? You can because you look at all the facts in this case, all the summary judgment evidence. And the summary . . . Okay, so another piece of that evidence is that another one of the individuals who voted in this decision, Judge Bond, testified that the decision was based on race. Except he doesn't support any of that with any evidence. That is an opinion that he stated. And why wouldn't he be entitled under Rule 701 to provide his lay opinion on that? Well, when you look at the evidence and look whether there's a discriminatory animus in this case because they have to use Ms. Shavira as part of that decision making to show that somehow she was treated better than him. That's not the case in this matter. I'm not sure that's true. I mean, I understand that you argued that and the magistrate judge applied that standard. But the plaintiff also mentioned that the fourth element of the prima facie case is flexible. And one of the ways you can meet it is if the circumstances suggest a discriminatory decision. And he mentioned that in his brief that wasn't addressed. And frankly, nobody, including the court or the parties, applied the prima facie case that applies to reductions in force. But isn't there circumstantial evidence here in the form of Judge Bond's statements and other evidence that would allow him to surpass the prima facie case? I don't think so because even if you look at this court's opinions, I think there's a case called Turner v. Baylor. And that case talked about where there was some comments made to an employee. I believe that employee, Ms. Turner, was African American. And in that case, one of the other employees had made some comments about they had to treat some ghetto kids or some ghetto something. And she said that offended her. And then she actually wound up being disciplined for some variety of other things. And she said that showed discriminatory animus. And this court said, no, it did not. That was just a stray remark out here made by someone else. In this situation. Was it made by one of the decision makers? It was reported to one of the decision makers. Was the comment in Turner made by one of the decision makers? I don't think it was made by one of the decision makers. In this case, though, you look at Ms. Shavira. That's the individual that they're saying is being treated differently. Ms. Shavira's department came to an end. As noted, they're not the same type of departments. They're not similarly situated. She actually reports to him. She's been on the job for 20 years. It's mid-budget year. She's in the indigent health care services. The county makes a budgetary decision that they are going to contract out for those services. She floats around in various positions until all of those duties are responded to and passed off to Seton in Lockhart. And then from there, Commissioner Munoz and Commissioner Madrigal moved to end her employment at the end of the month. The evidence showed that on May 20th, 2013, that's when the commissioner's court met, and they moved to end her employment at the end of the month, just like they did for Mr. Heckemeyer. They were opposed to Judge Bond's amendment to that motion to extend her benefits through the end of the fiscal year, which would end in September the 30th of 2013. Commissioner Rowland was opposed to it. Commissioner Madrigal was opposed to it. And Commissioner Munoz was opposed to that. They wanted to end her employment at the end of the month. You're saying that the only way you can make a prima facie case here is to show disparate treatment between the plaintiff and a similarly situated comparator? That's what their claim is, is that they are using— I'm asking you. Is that your position that's the only way you can get there? I don't think that's the only way you can get there, but that's the facts that we're presented with in this case. That's not the only theory they presented. It's the only one the master judge addressed. But their brief also notes that the test is flexible and that the fourth element— they're different versions of the fourth element. They argued a different version. Except there's nothing in the record that supports that. Their brief makes generalized statements, conclusory statements that are not supported by any evidence. There's no evidence about when that comment was made, who that comment was made in reference to. I mean, you look at it and it says they held the same jobs. The summary judgment evidence showed that they didn't. There are statements in there that says that Caldwell County is a cauldron of racial tension. There's nothing there to support those statements. There's nothing to support any of those allegations, that there's favoritism boiling over in Caldwell County. Nothing, again, in the record to support that. What the magistrate did do is look at every claim that was raised by Mr. Hagemeyer, looked at the evidence submitted by the defendants, looked at his response, and looked at all the evidence that supported that his statements were just conclusory in nature. They were opinions. There's nothing in there that provides any guidance to this. Where you do go for guidance in hiring and firing individuals is you go to the actual minutes of the commissioner's court. That's how a commissioner's court speaks, is through its official minutes. And if you look back at just the evidence that was submitted, the historical facts in this case in 2011 will show you that Commissioner Munoz was not even on the commissioner's court. He had another year and four months before he was even elected to come on the commissioner's court. Mr. Hagemeyer claimed that he raised the alleged ADEA claim about the subsidizing of the dependent children benefits back in August 29th of 2011. That's well before he was even the county administrator. That's when he was the advisor to the commissioner's court. Then in September, on September 26th of 2011, that's where the minutes show you that the commissioner's court took up the consideration of hiring, creating two new positions. One was the HR position, and one was the county administrator position. The evidence will show you that the county administrator was hired, and he was confirmed on October 24th by a commissioner's court. All these policy changes that are cited in the briefing that Mr. Hagemeyer argues is part to show the sphere of authority of Judge Bond, those didn't even come into effect until after he had already been confirmed by the commissioner's court. Those policies were adopted on November 14th of 2011. And all that policy says is that the county judge will select and appoint the county administrator manager, even though the county administrator manager will report both to the commissioner's court and to the county judge. There's no policy in there that sets his term of employment for one year. There's no type of agreement. There's no policy that would allow for his term to run for one year. It is just, that's it. Besides that and the evidence that I referenced earlier concerning his job description, those are the only two places where you actually find any discussion of his salary, I mean of his employment. You asked a question earlier about his salary. It actually is in the record on appeal. I couldn't remember where it's at. It's part of the plaintiff's response to our MSJ. One of the evidence, one of the exhibits to that response shows you what the county budget is. I thought it was $110,000. I read that somewhere. That was his. And I think if you go on down and look at the indigent health care, she didn't receive that much money. Her salary was not the same as his. Does it say what it is? It puts a dollar amount on her salary? It does. The interesting thing about the county budget is when you look at it, it will show you the total amount of funds that are for that department. And so the actual funds for the county administrator department, similar to the indigent health care department, is actually a higher amount than the $110,000 because it allows them, if there's a need to hire staff to pay for supplies and buy office equipment and things like that. So you look at the next one over where I think it will actually provide a salary, and then it will have like the number one up there. I think that exhibit is really important with this discussion today and the questions. And the reason why I think that exhibit will actually show you that that department is not under the county judge. That department is a department all by itself over in the government administration of the commissioner's court section of the budget. If you go back and find the portion in that budget that actually refers to the county judge, it will show you the employees he has in his office that the commissioner's court certainly could not go back in there and say, I don't think you need two secretaries or three secretaries or an administrative assistant, so we're going to cut your budget this year. That's a position that assists him in his official duties as part of the local government code, and that is under his sphere of authority. But when you look at the way that the budget was adopted and these positions were created and who answers to these positions, you will see that it's not that he answers to the county judge. He answers on behalf of his eight departments to the commissioner's court. That's what his authority was, Mr. Hegemeyer. Lastly, I wanted to just touch on the portion that talked about the age discrimination claim. I think if you go back and actually look at the analysis done by the magistrate and look at the evidence that was submitted specifically in our exhibit that showed the number of employees, Mr. Hegemeyer claimed that he was being discriminated against because he was over the age of 40 and he didn't have dependent health care. Well, when you look at the actual county employment, there was 136 employees over the age of 40, and 16 of those received that supplement dependent health care. Under 40 years of age, there's only 71 employees, and only 10 of those received that. So the statistical analysis that was done did show that there was more money per person when you broke it out overall, but when you actually look at the sheer numbers, there's only 10 of the 71 versus 16 more of those that are entitled to that same benefit. I know I'm about to run out of time here. I wanted to just point out that the evidentiary shortfalls that are pointed out by the magistrate, those are fatal to Mr. Hegemeyer's claims. They do not show a Title VII cause of action. They do not show an ADEA retaliation claim. The county commissioner's court and the commissioner's request that the court affirm the district court's grant of the summary judgment and the dismissal for failure to state a claim. Thank you. Thank you, Mr. McGee. Judge, you saved five minutes. Thank you, Your Honor. Mr. McGee said it was important for you to look at the actual minutes, and I couldn't agree more because when Commissioner Rowland and Commissioner Madrigal voted against the budget that contained the county administrator's position back in 2011, they said not one word in opposition to the county administrator's position. To the contrary, Commissioner Rowland said he wanted more raises for the existing employees, and Commissioner Madrigal said he was opposed to a posting for an HR position. That was the only thing they said in opposition to this budget. They had not one word of criticism of the county administrator's position that was also included in that budget. And the next two years that budget came up, they voted for it. Then, after they decided to get rid of Ron Hegemeyer, they decided that their reason for getting rid of him, the reason that they took to the newspaper, was that the county administrator just cost too much money, and we've been against it all along. Well, they made that story up after the fact. The truth is they weren't opposed to it on grounds of cost before, and then when they did do it under made-up grounds of cost, they said, and we're going to take the money and move it over to Unit Road. There was a problem with that. Unit Road didn't need the money. Unit Road didn't ask for the money. The county was carrying excess reserves on its books at the time. That was Judge Bond's testimony. That was not conclusory. Those were facts. Judge Bond also testified to very important facts that the magistrate totally ignored in his careful opinion. He totally ignored how much money Ron Hegemeyer saved the county doing lawyer work in-house. He totally ignored the fact that Ron Hegemeyer could have saved the county $155,000 in relatives' fees if he had been allowed to stay on and complete the county's acquisition of the Walmart property that they turned into a justice center. The magistrate totally ignored those things. The magistrate just focused on the evidence that supported the defendant's conclusion. Judges aren't supposed to do that at summary judgment. The magistrate uncritically accepted the defendant's, quote, budgetary reason for eliminating the county administrator's position. He didn't touch it. Was he the only lawyer? I'm sorry? You say they could have saved money because of in-house legal work and then a realtor's fee. Was he the only lawyer? He did a tremendous amount of work for the county. There was no other lawyer to do that. That's my question. I thought there was somewhere I read in the briefs that there were other people on the commission staff that could do what he was doing. I'm not aware of that. I'm sorry, Your Honor. I can't answer that question today. I can tell you that Ron Hagemeyer was a real estate lawyer in Denver for many years, and he knew how to do real estate and he knew how to do it efficiently and properly, and that's why he was so valuable to that county at that time. Wasn't Judge Brown a lawyer? No. No? No. He's an equipment salesman, a technical equipment salesman. He's not a lawyer at all. The Greg Abbott opinion that Judge Clement asked about is number 322 in the brief. It was decided it was issued in 2005. And I guess the last point I want to make, if I have a few more minutes, is that the story that the defendant's made up is simply unworthy of credence. And the Supreme Court has told us that when a defendant makes up a story that is unworthy of credence, that in itself is circumstantial evidence of illegal discrimination. And we know the Reeves case very well because it came right through this court and it came right back to this court. But you can't believe a word they say about that budgetary reason. It's shot full of holes. And that in itself is additional circumstantial evidence of illegal discrimination. I thank you for your attention. If there are any more questions, I'm happy to answer. All right. Thank you, sir. Thank you, Your Honor.